PEOPLE v HUNTER

OPINION OF THE COURT

1. CRIMINAL LAW—EVIDENCE—PRELIMINARY EXAMINATION—MISSING
   WITNESS—CROSS-EXAMINATION—DILIGENCE.

   A transcript of the preliminary examination testimony of a
   missing witness may not be admitted into evidence at trial
   unless the defendant was afforded through counsel an adequate
   opportunity to cross-examine the witness during the prelimi-
   nary examination and unless the prosecution demonstrates its
   due diligence in attempting to procure the presence of the
   witness at trial.

2. CRIMINAL LAW—EVIDENCE—PRIOR TESTIMONY—MISSING WITNESS—
   DILIGENCE.

   The prosecution in seeking the admission of a witness's prior
   testimony at trial must demonstrate that it diligently and in
   good faith attempted to procure the attendance of the witness;
   it is not enough to attempt to show that had an exercise of due
   diligence occurred, it would have been to no avail.

3. CRIMINAL LAW—EVIDENCE—PRELIMINARY EXAMINATION—MISSING
   WITNESS—DILIGENCE—DISCRETION.

   A trial judge abused his discretion in allowing a transcript of the
   preliminary examination testimony of a missing witness to be
   read to the jury at trial over defendant's objection where the
   prosecutor failed to demonstrate due diligence in attempting to
   procure the attendance of the witness in that the police never
   went beyond attempting to serve a subpoena at the address of
   the witness's mother, despite the fact that the witness's mother
   had informed the police that he was out of town and the police
   were informed that complainant's mother knew the identity of
   friends with whom the witness had left.

DISSENT BY O'HARA, J.

4. CRIMINAL LAW—EVIDENCE—PRELIMINARY EXAMINATION—MISSING
   WITNESS—DILIGENCE—DISCRETION.

   *A trial court did not abuse its discretion in holding that the*

REFERENCE FOR POINTS IN HEADNOTES
[1-4] 21 Am Jur 2d, Criminal Law §§ 337, 343, 344.

*prosecution had demonstrated due diligence in attempting to
secure the presence of a missing witness at trial, thereby
permitting a transcript of the witness's preliminary examina-
tion testimony to be read to the jury, where the witness's
mother had testified unequivocally that she had affirmatively
informed the police that she had no idea where her son was
and that she knew nobody who would know and where a police
officer testified as to four or five attempts to serve a subpoena
at the witness's last known address.*

Appeal from Recorder's Court of Detroit, James
S. Thorburn, J. Submitted Division 1 March 13,
1973, at Detroit. (Docket No. 14615.) Decided July
25, 1973. Leave to appeal denied, 390 Mich —.

Author Hunter was convicted of larceny from
the person. Defendant appeals. Reversed and re-
manded.

*Frank J. Kelley,* Attorney General, *Robert A.
Derengoski,* Solicitor General, *William L. Cahalan,*
Prosecuting Attorney, *Dominick R. Carnovale,*
Chief, Appellate Department, and *Thomas P.
Smith,* Assistant Prosecuting Attorney, for the
people.

*Thomas A. Neenan,* for defendant on appeal.

Before: FITZGERALD, P. J., and V. J. BRENNAN
and O'HARA,* JJ.

V. J. BRENNAN, J. Defendant was convicted of
larceny from a person (MCLA 750.357; MSA
28.589) by a jury in the Detroit Recorder's Court.
The evidence against the defendant consisted of
the complainant's testimony, the testimony of the
arresting police officer, and the testimony of com-
plainant's son. The testimony of complainant's son

---

* Former Supreme Court Justice, sitting on the Court of Appeals by
assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

was read to the jury, over the objection of the defendant, from a transcript of the preliminary examination.

The sole argument raised by the defendant on appeal is that the trial court erred by receiving into evidence the preliminary examination testimony of complainant's son. Provision for the admission of such testimony under certain circumstances is made in the statutes:

"Testimony taken at an examination, preliminary hearing, or at a former trial of the case, or taken by deposition at the instance of the defendant, may be used by the prosecution whenever the witness giving such testimony can not, for any reason, be produced at the trial, or whenever the witness has, since giving such testimony become insane or otherwise mentally incapacitated to testify." MCLA 768.26; MSA 28.1049.

However, such a transcript may not be admitted into evidence unless the defendant was afforded "through counsel an adequate opportunity to cross-examine" the witness *(Pointer v Texas,* 380 US 400, 407; 85 S Ct 1065, 1070; 13 L Ed 2d 923, 928 [1965]; *People v Martin #2,* 21 Mich App 667; 176 NW2d 470 [1970])* and unless the prosecution demonstrates its "due diligence" in attempting to procure the presence of the witness at trial. *Barber v Page,* 390 US 719; 88 S Ct 1318; 20 L Ed 2d 255 (1968); *People v Nieto,* 33 Mich App 535; 190 NW2d 579 (1971); *People v McIntosh,* 389 Mich 82; 204 NW2d 135 (1973).

In the case before us, the prosecution did not attempt to demonstrate its good faith or due diligence in attempting to secure the presence of the witness, but instead attempted to establish that had they exercised the requisite diligence it would have been to no avail. After the trial court originally denied the prosecution's request to admit the

transcript, the prosecution recalled the complainant (the mother of the missing witness) to the stand. She testified that she had not seen her son for four to five months. She did not know anyone who had heard from her son, and did not know his whereabouts. However, she was familiar with the identity of the people with whom her son had left the city. She also testified as follows:

"*The Court:* You don't know where they [witness and friends] went to?

"*A.* No, because I never—I never even have been in that part of the country.

"*The Court:* Do you know anybody who would know where they went to?

"*A.* Not for sure.

"*The Court:* Any further questions?

"*Mr. Thompson [assistant prosecutor]:* Yes.

"*Q.* In addition, Mrs. Watts, this case has been up for trial a number of times, has it not, and you have had contact with the police in terms of this case. Did you at any time inform the police officers that you had no idea of where your son was?

"*A.* Yes, a couple of times.

\* \* \*

"*Q. [defense counsel]:* Mrs. Watts, did any police officers ever come to your house in an attempt to serve a subpoena on your son?

"*A.* Well, they have came to the house and left them with the children, and, I mean, other kids. Sometimes we went home and found them in the mailbox.

"*Q.* Nobody ever served you personally, is that correct?

"*A.* No."

Following this testimony, the trial court was prepared to admit the transcript because, " \* \* \* all due diligence in the world would not have availed \* \* \* ". At the insistence of defendant's counsel, the police officer charged with serving the subpoe-

nas for the attendance of witnesses in this case was called to testify. His entire testimony, the only testimony which recounts firsthand the efforts of the people to produce the missing witness, appears in the transcript as follows:

"*Q. [assistant prosecutor]:* Witness, would you state your name for the court.

"*A.* George Steffler, police officer, City of Detroit.

"*Q.* What is your particular assignment with the Detroit Police Department?

"*A.* I serve court papers for the court, subpoenas, any other type of paper that would be necessary.

"*Q.* Did you have a subpoena to serve on a person identified as Murray Watts?

"*A.* Yes. By checking the files, in fact, I have had it about four or five different times, subpoenas to serve on him.

"*Q.* Did you have occasion to go to a previously indicated address?

"*A.* It's always been the same address.

"*Q.* What address is that?

"*A.* 2208 Lakewood.

"*Q.* Did you ever have any contact with Mrs. Watts at that address?

"*A.* Not personally, no.

"*Q.* Did you ever make any effort to determine whether or not he lived there?

"*A.* Yes. One time I went and I received an answer to my knock. I believe it's the girl that answered and said she was either his sister or the daughter, or somebody. I believe it was his sister. She said she would take them. There was one for the mother and one for the son.

"*Q.* You made no independent investigation other than this as to whether he lived there?

"*A.* No."

The trial court, over defendant's continuing objection, admitted the transcript. In *People v Tees,* 386 Mich 483; 192 NW2d 241 (1971), our Supreme

Court held that on the facts of that case the prosecution had failed to demonstrate the requisite diligence and reversed this Court's contrary determination (23 Mich App 476; 179 NW2d 33 [1970]). The efforts employed by the prosecution to locate one of the missing witnesses in *Tees* were detailed in the opinion of this Court as follows:

"Detective Leaf testified that he was unable to find Connie Wood, that he made a diligent inquiry as to her whereabouts, that he made a diligent effort to serve a subpoena upon her, that he went to the address that she gave at the time of the preliminary examination, but that she wasn't there anymore, that she had said at the time of the examination (over a year before the trial) that she was leaving upon the completion of the testimony for California, that she refused at that time to tell the police where she was going in California, and that he had talked with defendant Tees regarding Miss Wood's whereabouts and that Tees said he knew she was in California but that he did not know her address.

"That testimony indicates that the people did not know where in California to look for Miss Wood and that she had refused to give them her address when she moved there over a year before the trial. Additionally, defendant Tees, a social acquaintance of the witness, was unable to give them her address in California." (23 Mich App at 480–481; 179 NW2d at 35.)

More recently, in *People v McIntosh, supra,* pp 86–87; 204 NW2d at 137, our Supreme Court held the following efforts to locate a missing witness to be inadequate:

"In their effort to locate Wrenn, the police checked at his residence and his place of employment in Flint. They were told that Wrenn had left Michigan, and could now be found in North Carolina. One informant told them that Wrenn was in prison in North Carolina, the other that he was living on Webb Avenue in Burlington (possibly under the name 'Danny Hill').

"The police efforts to pursue these leads were:

"1) They contacted telephone information for Burlington and were told that there was no Wrenn or Hill listed on Webb Avenue.

"2) They contacted the Burlington Police Department and asked them to check on the whereabouts of Wrenn. No reply was ever received from the Burlington Police.

"North Carolina Prison authorities were never contacted before trial."

The efforts by the police in the case before us, which would not even have appeared in the record save for defense counsel's insistence, were even more inadequate. Here the police never went beyond attempting to serve a subpoena, despite the fact that the witness's mother had informed the police that he was out of town. In both *Tees* and *McIntosh, supra,* the police did more than merely attempt to serve a subpoena, and yet the efforts were still held to be inadequate.

When seeking the admission of a witness's prior testimony, the prosecution must demonstrate that it diligently and in good faith attempted to procure the attendance of the witness. It is not enough to attempt to show, as did the prosecutor here, that had an exercise of due diligence occurred, it would have been to no avail. Furthermore, even though it is not necessary to the disposition of the case, we note that the prosecutor even failed to establish that due diligence would have been to no avail. The testimony in the case established that the witness had left Detroit with some friends to seek employment somewhere in the South. Complainant's mother knew the identity of these friends. Surely someone in that group had been in touch, or some friend or relative of a member of that group knew where or how to reach these individuals. Judge Thorburn clearly abused

his discretion in allowing the preliminary examination transcript to be read to the jury, and we therefore must reverse.

Reversed and remanded.

FITZGERALD, P. J., concurred.

O'HARA, J. *(for affirmance).* The question presented on this appeal may properly be stated as "how much diligence is due diligence?"

My disagreement with Judge BRENNAN stems from the statement that "the prosecution did not attempt to demonstrate its good faith or due diligence in attempting to secure the presence of the witness, but instead attempted to establish that had they exercised the requisite diligence it would have been to no avail".

The trial judge originally denied the prosecution's request to admit the transcript of the testimony given by the missing witness at the preliminary examination. Thereupon the prosecution recalled the complaining witness who was also the mother of the missing witness. The key questions and answers were:

"*The Court:* You don't know were they [witness and friends] went to?

"*A.* No. Because I never—I never even have been in that part of the country.

"*The Court:* Do you know anybody who would know where they went to?

"*A.* Not for sure.

"*The Court:* Any further questions?

"*Mr. Thompson [assistant prosecutor]:* Yes.

"*Q.* In addition, Mrs. Watts, this case has been up for trial a number of times, has it not, and you have had contact with the police in terms of this case. Did you at any time inform the police officers that you had no idea of where your son was?

"*A.* Yes, a couple of times."

Since the complainant testified unequivocally that she had affirmatively informed the police that she had no idea where her son was it would seem to me that this closed this avenue of inquiry. This was not an after-the-fact explanation that further inquiry would have been of no avail. It was rather a point blank statement that she on several prior occasions told the police she didn't know where the missing witness could reasonably be expected to be found. The court's question further covered the key point, namely, did she know anybody who would know where they (the witness and his friends) had gone. A police officer testified as to "four or five" attempts to serve a subpoena at the witness's last known address.

I read *People v Tees,* 386 Mich 483; 192 NW2d 241 (1971), to hold only that the mere fact showing the witness was in the Navy and outside the state did not excuse the prosecution from any effort to procure his presence. *Tees* is no authority for the test of diligence required in the present case. *People v McIntosh,* 389 Mich 82; 204 NW2d 135 (1973), stands for the proposition that specific leads as to the whereabouts of a missing witness must be checked out. It does not address itself to the situation where there are no leads. I do not believe the Supreme Court meant in either *Tees* or *McIntosh* that the prosecution has to mount a full scale manhunt to locate a missing witness. To me reasonable diligence and due diligence were shown here.

I cannot see any abuse of discretion, let alone a clear abuse of discretion in the holding by the trial court.

I would affirm.